# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

_____

MELISSA KAY BELANGER,

                Petitioner,

v.                                    Case Number: 07-cv-11336

CLARICE STOVALL,

                Respondent.

_____/

## OPINION AND ORDER
## DENYING PETITIONER'S "PETITION FOR WRIT OF HABEAS CORPUS"
## AND DECLINING TO ISSUE A CERTIFICATE OF APPEALABILITY

Petitioner Melissa Kay Belanger, a state inmate currently incarcerated at the Huron Valley Complex–Women's in Ypsilanti, Michigan, filed a *pro se* application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  In her *pro se* pleadings, Petitioner challenges her convictions and sentences for (1) first-degree premeditated murder, Mich. Comp. Laws § 750.316(1)(a), (2) solicitation of murder, Mich. Comp. Laws § 750.157b(2), (3) conspiracy to commit murder, Mich. Comp. Laws § 750,157a, and (4) arson of a dwelling house, Mich. Comp. Laws § 750.72A.  She was sentenced to concurrent prison terms of (1) life without parole for the first-degree murder conviction, (2) life for the solicitation of murder conviction, (3) life for the conspiracy to commit murder conviction, and (4) one term of eight to twenty years for the arson of a dwelling house conviction.  For the reasons stated below, the court will deny the petition.  The court will also decline to issue Petitioner a certificate of appealability.

# I. BACKGROUND

This case arises out of the stabbing death of James Orban by Jason Belanger ("Jason").[1]  The prosecution's theory was that Petitioner aided and abetted Jason in the commission of first-degree premeditated murder.  The prosecution argued that Petitioner solicited others to commit the murder, assisted with the commission of arson of a building, and conspired with Jason and others to commit the murder.  The defense argued that Petitioner did not assist in the commission of the murder, but rather, she was, at most, an accessory-after-the-fact.  The defense also argued that Jason's testimony, which was significant in implicating and ultimately convicting Petitioner, was unreliable.

On October 13, 2001, Jason Belanger was Petitioner's boyfriend and not yet her husband.  Jason forcibly entered the James Orban residence, where he attacked and stabbed Orban.  Orban suffered fatal injuries to his neck, chest, and abdomen.  After the assault, Jason met Petitioner at a local Bingo Hall.  They eventually returned to their apartment.

The following day, Petitioner, Jason, and Steven Colorite went to a gas station, where Petitioner purchased gasoline.  They returned to the apartment, where Jason, while out of the sight of the other two, poured the gasoline into plastic bottles.  Later that evening, Jason and another friend, Jimmy Ristau, returned to the Orban home, entered, poured gasoline on the body of the deceased, and set the home on fire.

---

[1]Petitioner and Jason Belanger married after the murder.

2

Investigators from both the Alpena Police Department and the Michigan State Police determined that the fire had been intentionally started, and that Orban died as the result of a stabbing.  The police interviewed Jason on October 18, 2001, and he confessed, saying that he had acted alone in the commission of the arson and murder. In January 2003, however, Jason entered into plea negotiations and eventually reached a plea agreement with the prosecution in which he entered a plea of guilty to second-degree murder in exchange for his testimony in the case against Petitioner.  Acting upon his revised account of the events between October 13, 2001 and October 15, 2001, the Alpena City Police Department arrested Petitioner on March 5, 2003.

During pre-trial motion proceedings, the defense moved to dismiss, or alternatively quash, Counts I (murder) and III (solicitation of murder).  Both motions were denied.  A defense motion in limine to exclude any statements made by Orban was granted.  However, the trial court denied a defense motion in limine to exclude certain acts and a statement from co-conspirator Steven Colorite, provided the prosecution could lay a sufficient foundation before any statements were admitted and only after independent proof of the conspiracy had been demonstrated.

Petitioner's jury trial began on March 5, 2004, and lasted five days.  Arnold H. Domke, a lieutenant with the Alpena Fire Department who was on duty the night of October 15, 2001, was first to testify.  Lieutenant Domke testified that he responded to a 911 call, reporting a shed fire at 227 Alfred Street in Alpena, Michigan.  The shed was attached to the house.  Lieutenant Domke and two other firefighters entered the house through the front door.  The two firefighters searched the upstairs, and Lieutenant Domke proceeded toward the kitchen-living room area.  According to him, he saw the

3

kitchen table, along with some chairs, tipped over.  While in the kitchen, Lieutenant Domke also noticed a body, "compromised by the fire," lying on the floor.  (Trial Tr. vol. II, 218, March 8, 2004.)  Lieutenant Domke said that when he rolled the body over, a petroleum-like product was discovered.

Mark Edward Strange, a retired Detective Sergeant for the Michigan State Police Fire Marshal Division, was also at the scene.  According to Sergeant Strange, when he entered the house, he immediately noticed the body.  He said that he found the degree of fire damage done to the body suspicious.  Sergeant Strange testified that when he rolled the body over, a petroleum-like product came from underneath it.  The Sergeant also noted that, when paramedics removed the body from the scene, there was an absence of burn marks beneath the body, indicating that it had been lying on the floor prior to the fire starting.  Sergeant Strange also looked at all major appliances, and the electrical panel in the basement, and ruled out an accidental cause for the fire.  He also obtained various evidentiary samples from the scene and took them to the crime lab.

Ronald Nightingale, a Detective Sergeant for the Michigan State Police assigned to the Cheboygan Post, was the next witness.  Detective Nightingale testified that he arrived at the Orban home on October 15, 2001, around 1:15 p.m., and noted that the bedroom off the kitchen looked ransacked.  Working with Alpena Detective Raymond Skiba, Detective Nightingale said that he attempted to contact Petitioner.  He said that he left a message for her with her mother.  Detective Nightingale testified that he and Detective Skiba then went to get some dinner.  He said that Petitioner eventually found them at the Alpena Big Boy Restaurant around 9 p.m. that night.

4

According to Detective Nightingale, the officers asked Petitioner questions regarding her relationship with Orban. Petitioner told them that she had a grandfather-granddaughter-type relationship with him, that she would never hurt him, and that she believed she was the sole beneficiary of his will. At that time, the officers asked for and received consent to search Petitioner's apartment. The search yielded nothing of evidentiary value. However, Detective Nightingale said that he did observe a hand-held police scanner in the apartment and noted that that was unusual. He said that he also interviewed Jason Belanger that day, and, at that time, Jason denied having any involvement in Orban's death or the fire.

Detective Nightingale further testified that, on October 18, 2001, he took a statement from Jason, in which Jason admitted his involvement with the arson and murder. Detective Nightingale said that he then re-interviewed Jason in January 2003, fifteen months after the incident. Detective Nightingale testified that Jason's statement at that time was different than his original confession in October 2001.

Detective Rick Schultz, of the Michigan Department of State Police, testified that he arrived at the Orban house during the early morning hours on October 15, 2001. He said that he did a preliminary walk-through and made note of small blood spatterings and the general condition of the home. Detective Schultz also testified as to his general observations regarding the fire damage. According to Detective Schultz, he escorted the deceased's body from Alpena General Hospital to Grand Rapids, Michigan, for the autopsy to be performed by forensic pathologist Dr. David Start. During the autopsy, Detective Schultz noted that the condition of Orban's body was poor, due to the fire, and that a strong odor of petroleum products emanated from his body.

5

Detective Schultz testified that he interviewed Petitioner on October 17, 2001. According to him, during that interview, Petitioner stated that she was not involved in the murder, and that she loved Orban and would not do anything to harm him. She also said that she often cleaned his house and sometimes borrowed money from him. She denied having knowledge of what had happened or who was responsible for the murder and fire.

Detective Schultz further testified that he then re-interviewed Petitioner on November 13, 2001. During that interview, he said that Petitioner led the police to the dumpster behind a Subway restaurant, where Jason's clothes were found. The police then interviewed Jason, and confronted him with the evidence provided to them by Petitioner. That evening, Jason made a taped confession, detailing his involvement, and stating that he had acted alone. The police also confronted Jason with information obtained from Ristau, Jason's friend and alleged accomplice during the arson. Detective Schultz testified that he monitored phone calls from Jason to Petitioner up until November 13, 2001, but that those calls did not lead him to believe that Petitioner had any involvement beyond that already disclosed by her.

Detective Schultz testified that when he re-interviewed Petitioner on November 13, 2001, law enforcement personnel had already interviewed Jason, and had information regarding the weapon and a description of the actual assault. During that interview, Petitioner told Detective Schultz that Jason showed up at her bingo game and had blood on his clothing. She told Detective Schultz that she instructed Jason to go home and said that she followed him shortly thereafter. Petitioner told the detective that she told Jason to clean up, and then they discussed alibis. She said that she also tried

6

to call Orban's house, but no one answered.  Petitioner told Detective Schultz about her

involvement, along with Colorite and Jason, in getting the gasoline used in the arson;

Petitioner told him that Colorite paid for the gasoline.  She also said that she instructed

Colorite to drop Jason off, with the gasoline, near Orban's home.  Detective Schultz said

that Petitioner talked at length regarding her involvement with the cover up and her use

of the police scanner to monitor the fire and subsequent law enforcement reaction.

Detective Schultz then read into the record a signed document that Petitioner wrote

regarding her involvement in the events.

The next witness called was Detective Raymond Neil Skiba.  According to

Detective Skiba, he too responded to the fire reported at the Orban home.  Trained in

fire investigation, Detective Skiba testified that he assessed the premises, and quickly

determined that suspicious circumstances surrounded the fire.  Detective Skiba testified

that the condition of the body led him to conclude that an accelerant had been used to

speed up the fire.  He said that he also noted that the bedroom was in disarray.

Detective Skiba said that he also interviewed Petitioner on October 15, 2001,

around 3:00 p.m.  According to Detective Skiba, Petitioner indicated that she last saw

Orban on October 3, 2001.  Petitioner indicated that Orban often paid her for doing his

housework, and that he allowed her to use his car to go to bingo.  Detective Skiba

testified that Petitioner believed that Orban's vehicle was in her name, and that she was

included in his will.

After Detective Skiba's initial interview with Petitioner, he said that he located and

interviewed Jason.  During Jason's interview, Detective Skiba said that the police

confiscated a baseball cap containing human blood spots.  According to Detective

7

Skiba, later that evening, he saw Petitioner at the restaurant, and went back to her apartment to search for anything connected to Jason and the bloodied cap.  He testified that he interviewed Petitioner again on October 17, 2001.  During that interview, they talked about the gasoline that was purchased at the Alpena BP station, allegedly purchased to attempt to start Jason's motorcycle.

Then, on October 18, 2001, Detective Skiba testified that he interviewed Petitioner again.  According to him, he and Detective Nightingale both picked up Jason from the Lockwood apartment.  He said that they interviewed Jason, and then returned and picked up Petitioner, after Jason admitted to killing Orban.

Detective Skiba said that Petitioner told them what Jason had told her about entering the Orban house and murdering Orban.  According to the Detective, Petitioner mentioned, for the first time, that Jason killed Orban and then went to the bingo hall, but left soon after; she said that she left soon afterward as well.  Petitioner said that when she returned to her apartment, she tried to call Orban, to confirm Jason's confession at the bingo hall.  She said that she purchased the gasoline used to start the fire.  She provided a taped statement of this to the police.  The tape was played for jury.

According to Detective Skiba, Petitioner assisted them in attempting to locate evidence connecting Jason with the crime.  During the October 18, 2001 interview, Petitioner police them to a location where Jason' s bloodiest clothing had been placed in a dumpster.  On the way back to the Alpena Police Department, they stopped by her apartment to check for the coins taken from Orban's home, and eventually found them. Detective Skiba testified that he contacted Petitioner again on October 19, 2001, asking for her assistance in searching for the backpack used by Jason during the arson.

8

Detective Skiba testified that he again interviewed Petitioner in late November 2001.  During that interview, Petitioner discussed what she and Jason did between the death of Orban and the fire.  She also told him about the type of weapon used, a folding knife with a green handle that she knew was Jason's because she had seen him with it.  That weapon, along with a cap and a gun, was thrown off the Second Avenue Bridge in Alpena, but the items were later recovered by a dive team during the investigation.  Petitioner also told the detective that Jason gained access to the house by forcing the kitchen door open while Orban opened up the back door to let the cat out.

The prosecution next called Attorney Timothy Gulden.  Gulden handled Orban's probate affairs.  He testified that William Orban, James Orban's brother, was the sole heir of the estate.

Connie Swander, a forensic scientist working for the Michigan State Police, testified that she arrived at the Orban home around 4 p.m. on October 15, 2001.  She said that she saw blood stains at the scene and on Jason' s clothing recovered from the dumpster.  The scene and clothing blood samples matched Orban's DNA.  The blood stains on the cap matched Jason's DNA.

John Andrew Lucey, an employee of the Michigan Department of State Police, assigned to the Grayling Forensic Post, testified next.  Lucey's duties included receiving and analyzing the evidence from the fire debris.  He testified that he was called to the scene on October 15, 2001, and that he eventually performed an analysis of the debris, which exhibited the presence of gasoline throughout it.

Thomas Holcomb, a latent fingerprint examiner for the Michigan State Police, Grayling Forensic Science Laboratory, was called by the prosecution to testify regarding the identity of the body.  Holcomb identified the body as that of James Orban.

Jason Belanger testified for the prosecution.  He stated that although he was now married to Petitioner, he elected to waive the marital privilege.  Jason acknowledged that he signed an agreement in which he would plead guilty to second-degree murder in exchange for his testimony against Petitioner.

Jason testified that he moved in with Petitioner around September or early October in 2001.  He testified that Petitioner suggested several times, over a two-week period, that they could get money by killing Orban and inheriting his estate of up to two million dollars.  According to Jason, Petitioner tricked him and alleged she was pregnant in order to rob and kill Orban and get money for the wedding and the baby.  Jason admitted he killed Orban, but only at the urging of Petitioner.  Jason said that the murder was planned in advance by him, Petitioner, and a friend, Steve Colorite.  According to Jason, Petitioner's motive for the murder was that Orban, who up until that time regularly gave Petitioner money, was now refusing to do so.  Petitioner and Jason needed the money for drugs.

After Jason killed Orban, he testified that he, Colorite, and Petitioner decided that he should return to Orban's house the next day and set fire to the house, in order to destroy any evidence left behind.  The three then went to Petitioner's parents' house to steal a gas can.  Petitioner also took some matches and a police scanner from the house.  They then went to buy gas, for which Petitioner paid.  Petitioner drew a floor plan of Orban's house, showing Jason where the money, and other valuables, could be

10

found.  Two days after Jason set fire to Orban's house, he and Petitioner got married, believing that, if ever caught, spouses could not testify against each other.

According to Jason, he believed that Orban didn't care for him because of his relationship with Petitioner.  Jason testified that he believed that Petitioner and Orban had a sexual relationship.  Additionally, he said that he and Orban got into a verbal altercation prior to the murder.

Jason testified that, during the time leading up to the murder, Colorite moved into their house, and, according to Jason, he eventually became involved in the conversations about the murder of Orban.  Jason testified that he asked Colorite to drive him downstate so that he could get a gun, but Colorite refused and instead offered up his knife as a potential weapon.  Jason said that, on October 10, 2001, he, Colorite, and Petitioner discussed alibis for the night of October 13, 2001: Colorite would be working at Walmart, and Petitioner would be at bingo.  Jason testified that it was then that he first decided to actually kill Orban.

Testifying to the October 13, 2001 events, Jason said that, on the day in question, Petitioner left for bingo around 5 p.m.  He said that he left to go to the Orban house around 9 p.m., armed with Colorite's knife. Jason said that, once he reached the house, he entered through the kitchen and attacked Orban.  According to Jason, during the struggle, kitchen furniture was knocked over.  Ultimately, Jason said that he stabbed Orban five times.  According to him, after the assault, he left the home, believing that Orban was still alive.

Jason further testified that he first went to an ex-girlfriend's house to see if he could change clothes and clean up, but she was not home.  He said that he then went

11

to the Senior Citizens Center, where Petitioner was playing bingo.  He said that he found her, told her what happened, and then left to go back to their apartment to get cleaned up.  He said that the door to the apartment was locked, so he went to purchase cigarettes and ripped off the sleeves of his jacket, dumping them in a dumpster.  On the way back to the apartment, he saw Petitioner pull up in her sister's car, and she, along with Laura Spencer, gave him a ride back to their apartment.  Once back inside the apartment, he said that he took off his clothes, put them in a garbage bag, and then showered.  The garbage bag was thrown into a dumpster behind Subway later that evening.

According to Jason, later that evening, Colorite returned from work and talked with both Petitioner and Jason.  He asked about his knife, and Jason told him that he left it at Orban's house after stabbing him.  Jason testified that Colorite then suggested that they burn down the house to cover up the evidence.  In the morning, the three again discussed and formulated a plan for burning down the house.

Jason said that around 9 p.m. that evening they went to get gasoline, which Petitioner paid for, and also purchsed a book of matches.  He said they returned to the apartment with the gasoline, where Jason poured the gasoline into pop bottles and placed them into a backpack.  According to Jason's testimony, Petitioner then drew him a map of the Orban house, detailing where she thought various items were located, including morphine, coins, and cash.

Jason further testified that Petitioner and Colorite then drove him to within a few blocks of the Orban home around 11:15 p.m. that night where Jason, unbeknownst to Colorite and Petitioner, met Ristau, a friend he had contacted earlier in the day.  He

12

said they entered the house, and while Ristau searched for the cash and other items using the map, he poured the gasoline.  Jason said that Ristau was able to locate the coins, and that he found the knife and a shirt that he had used the previous night.  He testified that he ignited the gasoline, and then they both left.  Jason also testified that Ristau hid the coins in Petitioner's bathroom cupboard, without her knowledge, and at some point dumped the remaining contents of the backpack over the bridge.

Jason acknowledged that he and Petitioner were engaged to be married, but that they agreed to speed up the wedding, in part, to take advantage of spousal privilege. Jason said that they married on October 16, 2001.  He testified that he was eventually arrested in connection with Orban's murder, but he did not implicate Colorite or Petitioner during the initial interviews, in letters he wrote from jail, or in his October 2001 confession.  Jason said that when he wrote the letters, which indicated that Petitioner was not involved in the homicide, he was trying to protect her, knowing that the letters would eventually be seen by the police.

Dr. David Start, a forensic pathologist testified next.  Dr. Start performed the autopsy on Orban, identifying five stab wounds and a fractured right upper arm. Although Orban's body was significantly burned, Dr. Start determined that he had died prior to the fire as there was an absence of black soot in the airway.  Dr. Start stated that a wound to the jugular vein could have been in and of itself fatal, and that Orban died within minutes of the attack.  Given the nature of the stab wounds, Dr. Start had difficulty determining the exact type of knife used in the crime.

Sharon Brousseau, who frequently babysat at the house directly across the street from Orban's home, testified that she often saw Petitioner at the Orban home,

13

and that Petitioner often drove Orban's vehicle.  Brousseau testified that she was of the opinion that Petitioner and Orban appeared to have a physical relationship, and that the relationship was often evident in their interactions in Orban's driveway.

Ruth Ann Belanger, Jason's aunt, was also called as a witness by the prosecution.  According to her, the morning after Jason was arrested, Petitioner told her she knew Jason committed the murder, and that Orban had been stabbed five times.  Ruth Ann also testified she had received a hand-written invitation for Jason and Petitioner's upcoming wedding, but later became aware that the two had already married.

The prosecution next called Christine Slater, who often played bingo at the Senior Citizen's center.  Slater testified that she was at bingo, on the night in question, and that Petitioner was also there.  Slater said that she saw Jason come into the bingo hall that night, and then witnessed Petitioner and Jason go out into the hallway to talk.  She testified that Petitioner left bingo around 8 or 9 p.m.

Susan Gries, who was also familiar with Petitioner from bingo, testified that Petitioner normally sat in a different position than the one she took up on that night.  Gries said she saw Petitioner talking to Jason in the hallway at one point during bingo.

Lawrence LaMay, a friend of Petitioner and someone she had dated briefly, testified that both he and Nicholas Kolonowski were at Petitioner's apartment in late September or early October 2001.  He said that while they were there, Petitioner asked both of them if they would kill Orban, someone whom he had heard of but did not know personally.  In exchange, Petitioner promised to give LaMay half of whatever she inherited from Orban.  LaMay declined Petitioner's offer.

14

The defense then called witness Nicholas Gary Kolonowski for purposes of cross-examination. Kolonowski testified he was at Petitioner's apartment, along with LaMay and Jason, in early October. According to him, Petitioner asked him if he ever thought about breaking into a house, and if he would actually break into a house. Kolonowski denied that Petitioner ever asked him to kill Orban. Nevertheless, he admitted that he told a police officer during an interview that Petitioner had asked him to kill Orban, but he claimed that the statement was a lie, and that the officer had pressured him into making the false statement.

The prosecution next called Laura Spencer, Petitioner's cousin. Spencer testified that she was not in the vehicle with Petitioner and Jason on the night of October 13, 2001. She said that she saw Petitioner on October 14, 2001, when she came to her apartment looking for Colorite. She also said that she saw Petitioner shortly after the fire and testified that Petitioner told her that she was inheriting Orban's estate.

Mandy Marek Pickett testified next. She testified that she had a conversation with Petitioner toward the end of September 2001 about Petitioner's relationship with Orban. According to Pickett, Petitioner told her that Orban bought her a new car, that he gave her money to play bingo, and that she wished he would die soon so that she could inherit his estate. Pickett stated she had contact with Petitioner after the fire and testified that Petitioner asked her how long she would be in jail if she was an accessory to murder. Pickett said that Petitioner showed her numerous letters that Jason had written to her from jail.

Gweneth White-Erickson, a Detective Sergeant at the Michigan State Police Post in Petoskey, Michigan, testified that she and her partner arrested Petitioner in the

15

Harbor Springs area on March 5, 2003.  Detective White-Erickson said that she read

Petitioner her *Miranda*[2] rights.  She said that Petitioner did not talk during the car ride,

but the officers later interviewed her at the Petoskey Post and videotaped the interview.

The tape was played for the jury.

On the fourth day of trial, the prosecution called Mandy Smith, an employee of

Alpena County.  She testified that Petitioner came into her office and requested to see

Orban's will.  Smith said that she directed her to the Probate Court because that was

where the wills were on file.  Petitioner's and Jason's marriage license was also

admitted into evidence.  Smith testified to the fact that the marriage license was applied

for on October 10, 2001.

Anita Henson, an employee at the Alpena BP gas station, testified that she

remembered Petitioner coming into the station to buy gas in October 2001.

Sarah Larson Erickson testified next.  She lived with Petitioner in 1999 and

remembered being introduced to Orban.  She testified that Petitioner had talked about

"hitting him over the head with a frying pan," but added that she wasn't serious about it.

(Trial Tr. vol. IV, 646, Mar. 10, 2004.)

Rose Jackowiak, Orban's neighbor testified as to how familiar she was with

Petitioner.

> Q:   So you were familiar with Mr. Orban?
> A:   Yes.  Definitely.
> Q:   So was he a neighbor of yours?
> A:   Yes.
> Q:   Are you familiar with [Petitioner]?
> A:   Yes.

---

[2]*Miranda v. Arizona*, 384 U.S. 436 (1966).

> Q:   And how are you familiar with her?
> A:   It goes back a long time.  Uh, her and her sister had tried
>      to rob him–

(Trial Tr. vol. IV, 650, Mar. 10, 2004.)  Defense counsel immediately objected, and the

jury was directed to leave the room.  With the jury out of the courtroom, the prosecution

continued the line of questioning, which was ultimately directed at Jackowiak's

witnessing of an argument between Orban and Petitioner in which Orban stated that he

was not going to give Petitioner any more money.  Defense counsel moved for a

mistrial, arguing that the jury was tainted.  The prosecution suggested that the witness

continue to testify as to what she heard, and that the trial court instruct the jury that what

she did was not robbery and no legal basis substantiated the witness' remark.  The trial

judge then ruled: "I'm not going to declare a mistrial only for one reason; we have been

here for three or four days trying this case.  There's a lot of testimony.  I don't know

what the Court of Appeals can make of this, but clearly this was error, and clearly, in my

opinion, detrimental."  (Trial Tr. vol. IV, 657, Mar. 10, 2004.)  While the prosecutor

agreed that this statement was prejudicial, she maintained that the judge could address

the jury and explain that the witness made an inaccurate legal determination.  When the

jury returned to the courtroom, the judge gave cautionary instruction:

> Members of the jury, testimony concerning any other crime or offense is
> not admissible in any trial.  That's only part of the problem here.  The rest
> of the problem is the witness who testified about a robbery did not have
> first-hand knowledge of that at all.  It was hearsay; wasn't admissible; so it
> wasn't admissible for two reasons.  So it's something you should give this
> much consideration to: Absolutely none.  If we had to rely in this world on
> things we hear from other people, we'd all be in trouble.

(Trial Tr. vol. IV, 667, Mar. 10, 2004.)

17

Concerned with the relevancy of the forthcoming testimony, the judge initially required the next witness, Teri Rouleau, to testify outside the hearing of the jury as an offer of proof. Ultimately, Rouleau was permitted to testify before the jury. She testified that, sometime in 2001, Petitioner had suggested that she, Teri, and Lawrence LaMay kill Orban for his money. She also testified that she witnessed Orban giving Petitioner money on several occasions. On cross-examination, the witness admitted that she had a prior conviction for uttering and publishing.

Karen Scott, another of Orban's neighbors, testified that she observed Orban and Petitioner arguing in his driveway on July 5, 2001. Scott said that they were fighting about money, and that Petitioner was demanding money from Orban.

Larry Thomson, a Detective Lieutenant for the Alpena Police Department, became involved in the investigation on October 16, 2001. He interviewed Petitioner on October 18, 2001. He said that, during the interview, Petitioner provided information on the whereabouts of the bloody clothing worn by Jason, and led him and Detective Skiba to the dumpster containing the clothing. He said that Petitioner also permitted them to search her apartment for the coins taken from Orban's home.

Detective Thomson testified that he also secured the Orban residence on October 17, 2001, pursuant to a warrant. Various items and photographs found as a result of that search were offered into evidence. He testified to the evidence found off the Second Avenue Bridge, including a pistol, a pocket knife, and a knit cap, which was recovered by the dive team.

Finally, a December 2001 taped recording of a conversation between Petitioner and Jason, recorded while Jason was in the Alpena County Jail, was played for the jury.

18

The preliminary examination testimony of Jessica Matthes, who was unavailable to testify, was read to the jury. Matthes testified she was Petitioner's neighbor a few years prior to the trial, and on September 30, 2001, she went with Petitioner to Orban's house. She said that Petitioner asked to borrow Orban's car and asked for bingo money. Matthes said that Orban complied with those requests. According to her, she and Petitioner also discussed whether Petitioner was going to inherit Orban's estate at some point. Matthes testified that Petitioner said that she should poison him to hasten his death. Matthes did not take the statement seriously, but rather "just blew it off." (Trial Tr. vol. IV, 731, 738, Mar. 10, 2004.)

After a stipulation was entered that, if Jason were asked the question of who owned the BB pistol, then he would testify it belonged to Ristau and that Ristau brought it to Orban's house the night of October 14, 2001, the prosecution rested.

Prior to the start of the defense's case, the trial court addressed Ristau, who had waived his Fifth Amendment right against self-incrimination. The defense then presented its first witness testimony, the October 10, 2002, preliminary examination testimony of Colorite, which was read into the record.

Colorite testified that he lived with Petitioner in October 2001, and that Jason was living there as well. He testified that Petitioner's relationship with Orban was that of more than friends; that Orban and Petitioner were physically affectionate, and that he came over to her house often. After instructing the jury that the testimony to be read next referred to the night of October 14, 2001, the court read Colorite's description of the events that night.

19

Colorite testified that because Petitioner and Jason didn't have a car, they relied upon him to give them rides from time to time. He testified that, on that evening, Petitioner asked him to give Jason a ride to pick up a motorcycle. The three got in the car, and then Petitioner asked him to drive first to her parent's house to get a gas can, and then drive to the BP station. Colorite complied, and testified that he stayed in the vehicle while Jason pumped the gas and Petitioner paid for it. Petitioner then suggested they return to the apartment to look for oil to mix with the gasoline. They all then got back in the car and dropped Jason off on the north side. Colorite testified that Jason returned to the apartment around midnight. Colorite inquired about the motorcycle, and then Petitioner and Jason went into the kitchen to talk. The witness also described going with Petitioner to drop off Jason in the same area sometime prior to the fire, but he was unsure of the actual date.

The defense next called Bobbie Jo Ristau, Jimmy Ristau's stepmother. Ms. Ristau testified that on October 13, 2001, around 10 p.m., Jimmy was in their garage working on a bike. Ms. Ristau left for work around 10:30 p.m., and she returned the next day around 8 a.m. She said that she was unsure whether Jimmy was at home during that entire time period or whether he was even home when she returned from work. She was unable to identify the BB pistol presented in court as one belonging to Jimmy.

The defense next called David Lee Ristau, Bobbie Joe's husband and Jimmy's father. Mr. Ristau testified that he was at home on the night in question, but that he went to bed around 10 p.m. He said that he thought Jimmy was working in the garage

on a bike at that time.  He was unsure whether Jimmy was home during that time and was unable to identify the gun as belonging to his son.

After the police visited their home, the Ristaus retained a lawyer for Jimmy, who provided a statement for the police on the condition of immunity.

Davis John Ristau, Jimmy's brother, testified that Jimmy did not spend the night at his apartment the night of October 14, 2001 or October 15, 2001.

Defense counsel next called Jimmy Lee Ristau.  He testified that on the night of October 14, 2001, he was working in the garage on his bike around 10 p.m. and spent that night at home.  He testified that he did not talk to Jason on October 14, 2001, and denied meeting Jason at the Orban home.  He said that he did talk to Jason on the afternoon of October 15, 2001.  After disclosing what had happened at the Orban house, Jason asked him to lie to the police and tell them that he was at his house on Sunday night, the night of October 14, 2001 into the early morning on October 15, 2001. Jimmy testified that he initially lied to the police, but after retaining an attorney and obtaining an immunity agreement, he told police what he knew about the events.  In court, he testified that he did not own the BB pistol, and he denied having ever dropped any evidence off the Second Avenue Bridge.

Tracy Marie Christy testified that she and Jason had been living together in September 2001, but broke up later in the month.  She was unable to identify the BB gun or the pocket knife presented in court.  After that testimony, the defense rested.

The prosecution then presented Bernett Lindle as a rebuttal witness.  He testified that Jimmy Ristau often came to his house, and that Jimmy was at his house the evening of October 14, 2001.  He stated that Jimmy left his house sometime between 9

p.m. and midnight.  He also testified that at some point, Jimmy Ristau had asked him how to get blood out of clothing.

The prosecution also recalled Detective Schultz, who testified that he interviewed Nicholas Kolonowski on October 26, 2001.  He presented the taped interview to the jury.  The judge then instructed the jury that they were to listen to the tape for the limited purpose of determining whether Kolonowski felt pressured by the police during that interview, and whether that pressure led him to state that he had been asked by Petitioner to kill Orban as opposed to stating or doing something else.

On March 11, 2004, the fifth day of trial, court was initially held in-chambers. During that session, Petitioner acknowledged that she was knowingly and freely waiving her right to testify on her own behalf.  The parties also discussed a possible plea deal, in which Petitioner would be allowed to plead guilty to second-degree murder, which she rejected.  (Trial Tr. vol. V, 854, Mar. 11, 2004 (MR. PFEIFFER: And you've decided to reject that offer, is that correct?  THE DEFENDANT [PETITIONER]: Yes).)

That day, the jury convicted Petitioner as stated above.

Petitioner filed her right of appeal in the Michigan Court of Appeals, raising the following claims:

> I.   The trial court abused its discretion in denying [Petitioner's] motion for a mistrial by improperly considering the inconvenience of a mistrial at the expense of [Petitioner's] right to a fair trial after a prosecution witness testified that [Petitioner] committed another crime against the deceased victim.

> II.  The trial court reversibly erred in denying [Petitioner's] motion for a directed verdict as to the first-degree murder count, as the prosecution failed to present

> sufficient evidence that [Petitioner] was guilty as an
> aider and abetter to that murder.

Subsequently, in March 2005, Petitioner filed a *pro per* supplemental brief,

raising the following:

> III.    [Petitioner] was denied her constitutional right to
> effective assistance of trial counsel, such that she is
> entitled to a new trial.

On December 22, 2005, the Michigan Court of Appeals affirmed Petitioner's

convictions.  *People v. Belanger*, No. 256450, 2005 WL 3500839 (Mich. Ct. App. Dec.

22, 2005).  Petitioner filed a motion for reconsideration and a motion to remand for an

evidentiary hearing, which were denied.  *People v. Belanger*, No. 256450 (Mich. Ct.

App. Feb. 3, 2006).  Subsequently, Petitioner filed a timely application for leave to

appeal in the Michigan Supreme Court, raising the same claims as raised in the Court of

Appeals.  The Michigan Supreme Court denied the application on August 29, 2006.

*People v. Belanger*, 720 N.W.2d 323 (Mich. 2006).  On March 28, 2007, Petitioner filed

her petition for a writ of habeas corpus, raising the same claims as raised in the state

appellate courts.

## II.  STANDARD

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") governs

this court's habeas corpus review of state-court decisions and states in pertinent part:

> (d) An application for a writ of habeas corpus on behalf of a
> person in custody pursuant to the judgment of a State court
> shall not be granted with respect to any claim that was
> adjudicated on the merits in State court proceedings unless
> the adjudication of the claim–

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented at the State court proceedings.

28 U.S.C. § 2254(d).

A decision of a state court is "contrary to" clearly established federal law if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. An "unreasonable application" occurs when the state court identifies the correct legal principle from a Supreme Court's decision but unreasonably applies that principle to the facts of the prisoner's case. *Williams v. Taylor*, 529 U.S. 362, 412-413 (2000). A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411.

### III. DISCUSSION

### A. Motion for Mistrial

Petitioner first asserts that she is entitled to habeas relief because the trial court abused its discretion in denying her motion for a mistrial, after a prosecution witness, Rose Jackowiak, testified that she was familiar with Petitioner because "her and her sister tried to rob him [the victim]." (Trial Tr. vol. IV, 650, Mar. 10, 2004.) The defense moved for a mistrial following that comment. The trial court denied the motion but issued a curative instruction.

24

> Members of the jury, testimony concerning any other crime or offense is
> not admissible in any trial.  That's only part of the problem here. The rest
> of the problem here is the witness who testified about a robbery did not
> have any first-hand knowledge of that at all.  It was hearsay; wasn't
> admissible; so it wasn't admissible for two reasons.  So it's something you
> should give this much consideration to: Absolutely none.  If we had to rely
> in this world on things we hear from other people, we'd all be in trouble.

(Trial Tr. vol. IV, 667, Mar. 10, 2004.)

A trial court has the discretion to grant or deny a motion for mistrial in the absence of a showing of manifest necessity.  *Walls v. Konteh*, 490 F.3d 432, 436 (6th Cir. 2007) (citing *State v. Sage*, 510 N.E.2d 343 (1987)); *Clemmons v. Sowders*, 34 F.3d 352, 354-55 (6th Cir. 1994).  To the extent a petitioner's argument is based upon state law, the petitioner has failed to state a claim upon which habeas relief may be granted.  *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990).  A question concerning a perceived error of state law serves as a basis for habeas corpus relief only when the petitioner is denied fundamental fairness in the trial process.  *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991).  The rulings by a state's highest court with respect to state law are binding on the federal courts.  *Wainwright v. Goode*, 464 U.S. 78, 84 (1983). Furthermore, the Supreme Court has "reemphasize[d] that it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." *Estelle*, 502 U.S. at 68.  The federal courts are bound by decisions of an intermediate state appellate court unless convinced that the highest state court would decide the issue differently.  *Olsen v. McFaul*, 843 F.2d 918, 929 (6th Cir.1988).

The Michigan Court of Appeals, the last court to issue a reasoned decision in this case, stated in pertinent part:

25

"[T]he grant or denial of a mistrial is within the sound discretion of the trial court, and there must be a showing of prejudice to the defendant's rights if error requiring reversal is claimed." *People v. Gonzales*, 193 Mich.App 263, 265; 483 NW2d 458 (1992).

"A mistrial should be granted only for an irregularity that is prejudicial to the rights of the defendant, and impairs his ability to get a fair trial." *People v. Haywood*, 209 Mich.App 217, 228, 530 NW2d 497 (1995) (citations omitted). This Court recently concluded that a witness' reference to the defendant's previous incarceration was not grounds for a mistrial, holding that "not every instance of mention before a jury of some inappropriate subject matter warrants a mistrial." *People v. Griffin*, 235 Mich.App 27, 36; 597 NW2d 176 (1999). "[A]n unresponsive, volunteered answer to a proper question is not grounds for the granting of a mistrial." *Id.*, citing *Gonzales*, *supra* at 266-267. This Court has also concluded that "an isolated or inadvertent reference to a defendant's prior criminal activities will not result in reversible prejudice," but "when there are deliberate and repeated efforts by the prosecutor to impress upon the jury that a defendant . . . has committed other crimes, reversible prejudice results and a new trial must be ordered." *People v. Wallen*, 47 Mich.App 612, 613; 209 NW2d 608 (1973).

Here, the court rejected defendant's request for a mistrial and swiftly gave a cautionary instruction to the jury. Assuming the witness' comments constituted an irregularity in the proceedings, defendant has failed to demonstrate prejudice impairing her right to a fair trial. The remarks were not elicited by the prosecutor but rather were volunteered by the witness in response to a general question. The prosecutor did not make "deliberate and repeated efforts" to inappropriately introduce bad acts evidence. *Wallen*, *supra* at 613. The situation is distinguishable from *People v. Page*, 41 Mich.App 99; 199 NW2d 669 (1972), on which defendant relies, where the witness was a police officer "who would normally command the respect of the jury." *Id.* at 102. Here, the witness was a layperson whose testimony was cut short after only six introductory questions. The most prejudicial aspect to this testimony is the fact that the witness referenced another act that defendant had apparently committed against the victim. However, any prejudicial effect was significantly lessened by the court's cautionary instruction. The instruction was given almost immediately and thoroughly discredited the comment as unreliable hearsay and an inadmissible reference to a prior bad act. *Compare Griffin*, *supra* at 36-37 (concluding that even in the absence of a cautionary instruction an isolated reference to prior incarceration was not cause for a mistrial). This "isolated" and "inadvertent reference to a defendant's prior criminal activities" did not result in reversible prejudice. *Wallen*, *supra* at 613.

26

*Belanger*, No. 256450, 2005 WL 3500839, at *1.

To the extent that petitioner alleges violations of the Michigan Constitution, Michigan state law, or Michigan evidentiary rules, her claims are not cognizable upon federal habeas review.  A federal habeas court may only grant habeas relief to a petitioner "in custody in violation of the Constitution or law or treaties of the United States."  28 U.S.C. § 2241(c)(3); 28 U.S.C. § 2254(a).

To the extent that petitioner asserts that her federal constitutional rights were violated, her claims are without merit.  In *Gori v. United States*, 367 U.S. 364, 368-69 (1961), the Supreme Court, quoting Justice Story, emphasized that the scope of a trial judge's discretion with regard to declaring a mistrial is broad:

> [T]he law has invested Courts of justice with the authority to discharge a jury from giving any verdict, whenever, in their opinion, taking all the circumstances into consideration, there is a manifest necessity for the act, or the ends of public justice would otherwise be defeated.  They are to exercise a sound discretion on the subject; and it is impossible to define all the circumstances, which would render it proper to interfere.  To be sure, the power ought to be used with the greatest caution, under urgent circumstances, and for very plain and obvious causes.

*Gori*, 367 U.S. at 368-69 (quoting *United States v. Perez*, 22 U.S. 579 (1824)).

The record clearly establishes that the witness' answer was not solicited by the prosecutor but was instead volunteered in response to a general question.  *See United States v. Abdelsalam*, 311 F. App'x 832, 839-40 (6th Cir. 2009) (finding no abuse of discretion for denial of a mistrial when prejudicial witness testimony was unsolicited, the prosecution's line of questioning was proper, and the court issued an immediate curative instruction).  In the instant case, the prosecutor's line of questioning was not designed to elicit the answer given by the witness, nor should it have been expected to

27

so.[3]  *See id.*  Moreover, the court issued an immediate curative instruction to the jury as

described above.  The court concludes that the trial court acted immediately to remedy

the irregularity by issuing a prompt and clear cautionary instruction.  *See United States*

*v. Trujillo*, 376 F.3d 593, 609 (6th Cir. 2004) (finding that a defendant was not entitled to

a new trial when the prosecution's questioning of a witness resulted in unsolicited

testimony).  Absent contrary evidence, it is presumed that juries follow the instructions

that they are given.  *Washington v. Hofbauer*, 228 F.3d 689, 705 (6th Cir. 2000).

Accordingly, the Michigan Court of Appeals' determination that "any prejudicial effect

was significantly lessened by the court's cautionary instruction," *Belanger*, No. 256450,

2005 WL 3500839, at *1, is not contrary to, or an unreasonable application of, clearly

established federal law so as to entitle Petitioner to habeas relief.

## B.  Sufficiency of the Evidence

Petitioner next asserts that she is entitled to habeas relief because the trial court

erred in denying her motion for directed verdict with respect to the first-degree murder

charge.  Specifically, Petitioner asserts that the prosecutor failed to present sufficient

---

[3] The relevant testimony is as follows:

Q:      So you were familiar with Mr. Orban?
A:      Yes.  Definitely.
Q:      So was he a neighbor of yours?
A:      Yes.
Q:      Are you familiar with [Petitioner]?
A:      Yes.
Q:      And how are you familiar with her?
A:      It goes back a long time.  Uh, her and her sister had tried
        to rob him–

(Trial Tr. vol. IV, 650, Mar. 10, 2004.)

evidence upon which a trier of fact could convict her of first-degree murder on an aiding and abetting theory.  Respondent contends that this claim lacks merit.

To the extent that Petitioner relies upon state law to assert that she was entitled to a directed verdict on the first-degree murder charge, she fails to state a claim for habeas relief.  It is well-settled that habeas relief may not be granted for alleged violations of state law.  *See Estelle*, 502 U.S. at 67-68; *see also Shacks v. Tessmer*, 2001 WL 523533, at *6 (6th Cir. May 8, 2001) (finding no merit in petitioner's claim that the trial court erred in denying his motion for directed verdict of acquittal on first-degree murder charge based upon alleged state law violations).

Petitioner, however, also contends that the prosecution presented insufficient evidence to support a first-degree murder conviction.  The due process clause of the Fourteenth Amendment to the United States Constitution requires the prosecution to prove each element of an offense beyond a reasonable doubt before a defendant can be convicted of that offense.  *In re Winship*, 397 U.S. 358, 364 (1970).  In *Jackson v. Virginia*, 443 U.S. 307, 319 (1979), the United States Supreme Court established that a federal court's review of a sufficiency of the evidence claim must focus on whether "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 319; *DeLisle v. Rivers*, 161 F.3d 370, 389 (6th Cir. 1998).  The court must view this standard through the framework of 28 U.S.C. § 2254(d).  *See Martin v. Mitchell*, 280 F.3d 594, 617 (6th Cir.2002).  The court must apply the *Jackson* standard "with explicit reference to the substantive elements of the criminal offense as defined by state law." *Jackson*, 443 U.S. at 324 n.16.  "The mere existence of sufficient evidence to convict

29

therefore defeats a petitioner's claim." *Matthews v. Abramajtys*, 319 F.3d 780, 788-89

(6th Cir.2003) (citation omitted). In making this determination, the court must afford the

state court's findings of fact a presumption of correctness unless it is established by

clear and convincing evidence that the factual determination in the state court was

erroneous. 28 U.S.C. § 2254(e)(1); *West v. Seabold*, 73 F.3d 81, 83 (6th Cir. 1996).

The court looks to the last state court opinion addressing the merits of

Petitioner's sufficiency of the evidence claim, the Michigan Court of Appeals. In its

opinion, the Michigan Court of Appeals did not specifically cite the Supreme Court's

decision in *Jackson*, however, based upon the language of the opinion, it is clear that

the court applied the *Jackson* standard:

> Next, defendant argues that there was insufficient evidence to convict her
> of first-degree murder on an aiding and abetting theory. We disagree.
> This Court reviews claims of insufficient evidence de novo, *People v.
> Lueth*, 253 Mich.App 670, 680; 660 NW2d 322 (2002), and views the
> evidence in a light most favorable to the prosecution to determine whether
> a rational trier of fact could have found the essential elements of the crime
> were proven beyond a reasonable doubt. *People v. Johnson*, 460 Mich.
> 720, 723; 597 NW2d 73 (1999).
>
> Aiding and abetting in the commission of a crime is prohibited by MCL
> 767.39, which provides as follows:
>
> Every person concerned in the commission of an offense,
> whether he directly commits the act constituting the offense or procures,
> counsels, aids, or abets in its commission may hereafter be prosecuted,
> indicted, tried and on conviction shall be punished as if he had directly
> committed such offense.
>
> "The general rule is that, to convict a defendant of aiding and abetting a
> crime, a prosecutor must establish that (1) the crime charged was
> committed by the defendant or some other person; (2) the defendant
> performed acts or gave encouragement that assisted the commission of
> the crime; and (3) the defendant intended the commission of the crime or
> had knowledge that the principal intended its commission at the time that
> the defendant gave aid and encouragement." *People v. Moore*, 470 Mich.

56, 67-68; 679 NW2d 41 (2004). "The phrase 'aids or abets' is used to describe any type of assistance given to the perpetrator of a crime by words or deeds that are intended to encourage, support, or incite the commission of that crime." *Id.* at 63. "In determining whether a defendant assisted in the commission of the crime, the amount of advice, aid, or encouragement is not material if it had the effect of inducing the commission of the crime." *Id.* at 71. "First-degree premeditated murder requires proof that the defendant intentionally killed the victim and that the act of killing was premeditated and deliberate." *People v. Abraham*, 234 Mich.App 640, 656; 599 NW2d 736 (1999). "Premeditation may be established through evidence of the following factors: (1) the prior relationship of the parties; (2) the defendant's actions before the killing; (3) the circumstances of the killing itself; and (4) the defendant's conduct after the homicide." *People v. Schollaert*, 194 Mich.App 158, 170; 486 NW2d 312 (1992). Accordingly, to prove defendant was an aider and abetter, the prosecutor was required to show that at the time of the killing she either had the premeditated and deliberate intent to kill the victim or that she participated knowing that the principal possessed this specific intent. *People v. Youngblood*, 165 Mich.App 381, 387; 418 NW2d 472 (1988).

Here, there was sufficient evidence to establish that "the crime charged was committed by . . . some other person[.]" *Moore*, *supra* at 67-68. Defendant's husband testified that he stabbed the decedent five times with the sole intent of killing him. Autopsy results indicated that the decedent died from stab wounds.

Next, taken in the light most favorable to the prosecution there is sufficient evidence establishing that defendant provided encouragement and counsel that assisted in the commission of the crime. Defendant's husband testified that when the decedent "cut off" defendant financially, defendant suggested the two could get a lot of money by killing the victim because she expected a two million dollar inheritance from him. Indeed, if defendant's husband's testimony is believed the sole reason he killed the victim was because defendant wanted him to. Defendant's husband[] testified that he killed the victim "because [defendant] wanted me to . . . to get his inheritance" and that he had no other reason to kill him. Defendant's husband testified that defendant suggest that he kill the victim approximately ten times in a two week period prior to the murder. Additionally, the promise of a split inheritance is significant evidence to conclude that defendant encouraged the commission of the crime. Defendant's husband testified that he, defendant, and Steven Colorite came up with a plan for the murder that resulted in he and defendant taking seventy-five percent of the expected inheritance and Colorite taking twenty-five percent. Finally, testimony indicates that defendant

31

participated in planning the details of the crime.  Defendant's husband
testified that defendant suggested that he use his parents' gun to kill the
decedent and that he, defendant and Colorite decided the date that the
murder would take place.

Defendant contends that the prosecution must prove an overt act on the
part of the defendant to support her conviction of first-degree murder on
an aiding and abetting theory.  This argument is without merit. The plain
language of MCL 767.39 indicates that a defendant is guilty of aiding and
abetting "whether he directly commits the act constituting the offense or
procures, counsels, aids, or abets in its commission."  Here, defendant's
encouragement and words clearly constituted "counsel" as contemplated
in MCL 767 .39.

There is also sufficient evidence that defendant "intended the commission
of the crime or had knowledge that the principal intended its commission
at the time that the defendant gave aid and encouragement." *Moore*,
*supra* at 67-68.  Viewed in the light most favorable to the prosecution, the
evidence supports the conclusion that defendant had the deliberate intent
to kill the victim.  There was evidence that defendant requested that
another friend kill the decedent, requested that her husband kill the
decedent on at least ten occasions, and participated in planning his
murder.

*Belanger*, No. 256450, 2005 WL 3500839, at *2-3.

In reviewing the record, the court concludes that there was sufficient evidence

presented that a reasonable trier of fact could find beyond a reasonable doubt that

petitioner was guilty of first-degree murder on an aiding and abetting theory.  At trial, the

prosecution presented evidence that petitioner solicited Lawrence LaMay to murder the

victim before her husband agreed to do so; Petitioner encouraged her husband to kill

the victim by telling him she was pregnant and that they needed the money; Petitioner

was proven to have actively participated not only in the cover-up after the crime, as she

later admitted, but also in the planning of the murder.  Therefore, the court finds that

Petitioner has failed to establish that the state court's findings of fact were clearly

erroneous.  Thus, viewing the evidence in a light most favorable to the prosecution, this

court concludes that the Michigan Court of Appeals' decision did not result in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States.  28 U.S.C. § 2254(d)(1).  Accordingly, Petitioner is not entitled to federal habeas corpus relief with respect to this claim.

### C.  Ineffective Assistance of Trial Counsel

In this claim, Petitioner alleges that she was denied the effective assistance of counsel on the basis of five sets of alleged errors.

### 1.  First, second, and fifth set of alleged errors

In her first set of alleged errors, Petitioner asserts that (1) defense counsel withheld certain information from the judge and jury, specifically that a witness gave the prosecution information about a gun she claimed was involved in the crime, (2) defense counsel failed to inform the judge and jury that she had been interrogated at the office of her husband's defense counsel about one year prior to her arrest, and (3) defense counsel did not sufficiently question a witness, Jimmy Ristau, during his direct examination.

In her second set of alleged errors, Petitioner alleges that (1) defense counsel did not sufficiently cross-examine her husband, who testified for the prosecution. Specifically, Petitioner argues that defense counsel should have questioned her husband about a green knife, about his letters to her while she was in jail, about his coaching her in anticipation of her arrest in this case, and about his misidentification of the state in which her aunt lives.

33

In her fifth set of alleged errors,[4] Petitioner contends that her Fifth and Fourteenth Amendment due process rights were violated when defense counsel failed to object to perjury committed by the prosecution.  Specifically, Petitioner argues that defense counsel failed to object to two witnesses' testimony that the prosecution knew to be perjured.  Petitioner alleges that Michigan State Police Detective Rick Schultz perjured himself when he testified that petitioner told him during her interrogation that she had witnessed her husband dispose of his bloody clothing from the murder.  Additionally, Petitioner claims that her husband lied during his testimony when he said that she lived with him prior to Colorite living with her.

On direct appeal to the Michigan Court of Appeals, Petitioner raised her claim of ineffective assistance of counsel regarding the above-sets of alleged errors.  The court of appeals stated:

> Finally, in her supplemental brief defendant argues that her trial counsel was ineffective.  We disagree.
>
> Defendant has not fully preserved this issue because she did not move for a new trial or seek an evidentiary hearing.  *People v. Thomas*, 260 Mich.App 450, 456; 678 NW2d 631 (2004).  Therefore, this Court must review this issue based on the existing record only.  *Id.*
>
> * * *
>
> Defendant argues that she provided her defense counsel with information that he refused to address at trial or during her husband's cross-examination.  Defendant argues that she pointed out numerous instances where the prosecution solicited false testimony from witnesses and defense counsel refused to object.  But defendant's argument in this regard relies solely on information that is not part of the existing record.

---

[4]For purposes of analysis, the court will address Petitioner's third and fourth set of alleged errors later in this section.

Thus, this Court is unable to review these claims of error. *Thomas*, *supra* at 456.

*Belanger*, No. 256450, 2005 WL 3500839, at *3-4.

Although Petitioner filed a supplemental brief alleging ineffective assistance of counsel, she failed to request a *Ginther*[5] hearing regarding these alleged errors. Consequently, Petitioner has not met the diligence requirement outlined in 28 U.S.C. § 2254(e)(2) and *Williams*, 529 U.S. at 432-37. Under 28 U.S.C. § 2254(e)(2), a federal court can grant an evidentiary hearing in limited circumstances:

> (2) If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that –
>
> > (A) the claim relies on –
> >
> > > (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
> > >
> > > (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and
> >
> > (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

In *Williams*, the United States Supreme Court held that "under the opening clause of § 2254(e)(2), a failure to develop the factual basis of a claim is not established unless there is lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel. The *Williams* Court further explained that "diligence for purposes of the opening clause depends upon whether the prisoner made a reasonable attempt, in

---

[5] *People v. Ginther*, 212 N.W.2d 922 (Mich. 1973).

35

light of the information available at the time, to investigate and pursue claims in state

court." *Williams*, 529 U.S. at 435. The Court further stated that, "diligence will require in

the usual case that the prisoner, at a minimum, seek an evidentiary hearing in state

court in the manner prescribed by state law." *Williams*, 529 U.S. at 437.

Because Petitioner failed to move for a new trial or a *Ginther* hearing with respect

to her alleged errors on this claim, she has failed to meet the diligence requirements.

Therefore, she is not entitled to federal habeas relief on her ineffective assistance of

counsel claim regarding the first, second and fifth sets of alleged errors.

### 2.  Third set of alleged errors

In her third set of alleged errors, Petitioner claims that defense counsel was

ineffective for failing to object to certain instances of alleged hearsay testimony during

trial. Specifically, Petitioner argues that counsel failed to object to her husband's

testimony that she had drawn him a map of the interior of Orban's home in order for him

to locate the hidden money. Because no map was ever produced at trial, Petitioner

claims that her husband's testimony about the map was hearsay. Additionally,

Petitioner also argues that defense counsel failed to object, on hearsay grounds, when

her husband testified that she had been sexually molested by Orban and about her

emotional state after he told her that he had killed the victim.

Petitioner also argues that defense counsel should have objected to the alleged

hearsay testimony of prosecution witness Teri Rouleau, when Rouleau said that she

was told that Petitioner was having sex with Orban for money. Moreover, with respect

to Rouleau's testimony, Petitioner maintains that defense counsel should also have

objected to Rouleau's description of a conversation she had with Petitioner and one of

36

Petitioner's boyfriends as hearsay.  Petitioner also asserts that defense counsel was ineffective for failing to verify that the prosecution had laid a sufficient foundation as to the admission of the above statements.

Petitioner's claim as to these alleged errors is without merit.  The state courts did not address these claims because Plaintiff did not raise them as specific, individual arguments, and these claims are therefore procedurally defaulted.  A state prisoner's habeas claims are procedurally defaulted if the prisoner has failed to comply with an independent and adequate state procedural rule, thus causing default of the prisoner's federal claims in state court.  *See Coleman v. Thompson*, 501 U.S. 722, 750 (1991). This can occur when an individual fails to present an issue to a state appellate court upon the only opportunity to do so.  *See Teague v. Lane*, 489 U.S. 288, 297-98 (1989); *Rust v. Zent*, 17 F.3d 155, 160 (6th Cir. 1994).

In *Coleman*, the United States Supreme Court held that if the decision of the last state court to which a habeas petitioner presented his federal claims fairly appeared to rest primarily on federal law, or to be interwoven with federal law, and did not clearly and expressly rely on an independent and adequate state ground, a federal court may address the petition.  501 U.S. at 735.  The Court went on to note:

> This rule does not apply if the petitioner failed to exhaust state remedies and the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred.  In such a case there is a procedural default for purposes of federal habeas regardless of the decision of the last state court to which the petitioner actually presented his claims [citation omitted].

*Id.* at 735 n.1.

The Sixth Circuit employs a four-part test to determine whether a state procedural default bars federal habeas review. The inquiry is whether:

> (1) a state procedural rule exists that applies to the petitioner's claim, (2) the petitioner failed to comply with the rule, (3) the state court actually applied the state rule in rejecting the petitioner's claim, and (4) the state procedural rule is an adequate and independent ground upon which the state can rely to deny relief.

*Frazier v. Huffman*, 343 F.3d 780, 790 (6th Cir. 2003) (citing *Reynolds v. Berry*, 146 F.3d 345, 347 (6th Cir. 1998)); *see also Alexander v. Smith*, No. 06-1569, 2009 WL 426261 (6th Cir. Mich. Feb 20, 2009).

Regarding this claim, the Michigan Court of Appeals stated:

> Defendant also argues that defense counsel was ineffective for failing to object to numerous instances of hearsay.  However, defendant fails to cite the record for any of the alleged instances of hearsay, fails to state how each statement was hearsay, fails to analyze any of the alleged statements in any detail, fails to discuss whether trial counsel was pursuing a legitimate trial strategy, and fails to explain how each statement prejudiced her.  The only law cited by defendant, referencing the use of the confessions of non-testifying co-conspirators, is inapplicable.  Defendant's cursory treatment of this issue warrants the conclusion that defendant has abandoned this issue on appeal.  *People v. Watson*, 245 Mich.App 572, 587; 629 NW2d 411 (2001).

*Belanger*, No. 256450, 2005 WL 3500839, at *4.

Here, the procedural rule relied upon by the state appellate courts to bar review of these issue was firmly established and regularly applied at the time of Petitioner's default.  Petitioner thus procedurally defaulted these habeas claims.  A state prisoner who fails to comply with a state's procedural rules waives the right to federal habeas review absent a showing of cause for noncompliance and actual prejudice resulting from the alleged constitutional violation, or a showing of a fundamental miscarriage of justice.  *See Coleman*, 501 U.S. at 753; *Murray v. Carrier*, 477 U.S. 478, 485 (1986);

38

*Gravley v. Mills*, 87 F.3d 779, 784-85 (6th Cir. 1996). The cause and prejudice test should be applied to all occasions where a procedural default bars state litigation of a constitutional claim. *Coleman*, 501 U.S. at 750.

To the extent that Petitioner attempts to establish cause to excuse her procedural default by claiming that her appellate counsel was ineffective for failing to raise his claims in his direct appeal, she does not do so. Attorney error will not constitute adequate cause to excuse a procedural default unless it amounts to constitutionally ineffective assistance of counsel under the criteria established in *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

The mere failure to raise a claim, even if it is meritorious on appeal, does not constitute ineffective assistance of appellate counsel sufficient to establish cause to excuse a procedural default. The United States Supreme Court, in *Smith v. Robbins*, 528 U.S. 259, 288 (2000), stated:

> In *Jones v. Barnes*, 463 U.S. 745 (1983) [parallel citations omitted], we held that appellate counsel who filed a merits brief need not (and should not) raise every nonfrivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal. Notwithstanding *Barnes*, it is still possible to bring a *Strickland* claim based on counsel's failure to raise a particular claim, but it is difficult to demonstrate that counsel was incompetent. [*See*], *e.g.*, *Gray v. Greer*, 800 F.2d 644, 646 ([7th Cir.] 1986) ("Generally, only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome")

*Id.*; *see also McMeans v. Brigano*, 228 F.3d 674, 682 (6th Cir. 2000) (where claim was not "dead bang winner," the petitioner's appellate counsel's failure to raise it on direct appeal did not constitute cause to excuse procedural default).

In this case, the record reveals that various issues were raised in Petitioner's direct appeal, but that Petitioner's convictions were affirmed.  Petitioner fails to demonstrate that the issues that were allegedly ignored by her appellate counsel in her direct appeal were clearly stronger than those that were presented, and she has failed to overcome the strong presumption that her counsel was competent.  Because Petitioner has failed to establish cause for her procedural default, there is no need to determine whether Petitioner can meet the prejudice prong of the "cause and prejudice" test.  *Coe v. Bell*, 161 F.3d 320, 329 (6th Cir. 1998).

Neither Petitioner has established that a fundamental miscarriage of justice has occurred.  The miscarriage of justice exception requires a showing that a constitutional violation probably resulted in the conviction of one who is actually innocent.  *See Schlup v. Delo*, 513 U.S. 298, 326-27 (1995); *Murray v. Carrier*, 477 U.S. at 496.  "'[A]ctual innocence' means factual innocence, not mere legal insufficiency."  *Bousley v. United States*, 523 U.S. 614, 624 (1998).  "To be credible, [a claim of actual innocence] requires petitioner to support [her] allegations of constitutional error with new reliable evidence-whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence-that was not presented at trial."  *Schlup*, 513 U.S. at 324.  Petitioner has made no such showing.  Her assertion that her habeas claims have merit does not establish a miscarriage of justice.  These claims are thus barred by procedural default.

### 3.  Fourth set of alleged errors

In her fourth set of alleged errors, Petitioner claims that defense counsel was ineffective for failing to object to the introduction of the preliminary examination

40

testimony of two witnesses.  Specifically, Petitioner contends that counsel should have objected to the introduction of the preliminary examination testimony of Jessica Matthes, Petitioner's neighbor in October 2001, and the introduction of the testimony of Colorite, which was taken from her husband's preliminary examination in September 2002.  Colorite did not testify at Petitioner's preliminary examination in June 2003.

The Michigan Court of Appeals, the last court to issue a reasoned decision with respect to Petitioner's fourth set of alleged errors, stated:

> Finally, defendant argues that counsel was ineffective for not objecting to the introduction of preliminary examination testimony from two witnesses allegedly in violation of defendant's rights under the Confrontation Clause. A defendant has the right to be confronted with the witnesses against him or her.  US Const, Am VI; Const 1963, art 1, § 20; *Crawford v. Washington*, 541 U.S. 36; 124 S Ct 1354; 158 L.Ed.2d 177 (2004).  The Sixth Amendment bars testimonial statements by a witness who does not appear at trial unless the witness is unavailable and the defendant had a prior opportunity to cross-examine the witness.  *Crawford, supra*, 124 S Ct 1364-1365.  Here, it is clear that the preliminary examination testimony of these witnesses was testimonial, *see id.* at 1364.  Therefore, it could only be properly admitted against defendant if the witnesses were unavailable and defendant had the prior opportunity to cross-examine them. Defendant argues that this testimony violated her Confrontation Clause rights because defendant was denied the right to cross-examine the witnesses.  However, our Supreme Court has held that the preliminary examination testimony of a witness is admissible at trial where the party against whom the testimony is offered had an opportunity and similar motive to develop the testimony through cross-examination.  *People v. Meredith*, 459 Mich. 62, 66-67; 586 NW2d 538 (1998).  Whether a defendant had a similar motive to develop the testimony through cross-examination depends on the similarity of the issues for which the testimony was presented at each proceeding.  *People v. Vera*, 153 Mich.App 411, 415; 395 NW2d 339 (1986).  Here, the preliminary examination testimony was originally elicited by the prosecution to establish defendant's guilt and was introduced at trial for the same purpose.  Defense counsel cross-examined both witnesses at the preliminary examination in an effort to prove that defendant did not commit the crimes for which she was charged.  Accordingly, the introduction of the preliminary examination testimony does not violate defendant's rights

41

under the Confrontation Clause and defense counsel was not ineffective
for failing to object to its introduction.

*Belanger*, No. 256450, 2005 WL 3500839, at *4.

To show that she was denied the effective assistance of counsel under federal

constitutional standards, Petitioner must satisfy a two-prong test.  In *Strickland*, the

United States Supreme Court sets forth the two-pronged test for determining whether a

habeas petitioner has received ineffective assistance of counsel.  First, a petitioner must

prove that counsel's performance was deficient.  This requires a showing that counsel

made errors so serious that he or she was not functioning as counsel as guaranteed by

the Sixth Amendment.  *Strickland*, 466 U.S. at 687.  Second, a petitioner must establish

that the deficient performance prejudiced the defense.  Counsel's errors must have

been so serious that they deprived the petitioner of a fair trial or appeal.  *Id.*

In order to prove deficient performance, a petitioner must identify acts that were

"outside the wide range of professionally competent assistance."  *Strickland*, 466 U.S. at

690.  The reviewing court's scrutiny of counsel's performance is highly deferential.  *Id.*

at 689.  This court must recognize that counsel is strongly presumed to have rendered

adequate assistance and made all significant decisions in the exercise of reasonable

professional judgment.  *Id.* at 690.

To satisfy the prejudice prong under *Strickland*, a petitioner must show that

"there is a reasonable probability that, but for counsel's unprofessional errors, the result

of the proceeding would have been different."  *Id.* at 694.  A reasonable probability is

one that is sufficient to undermine confidence in the outcome.  *Id.*  "On balance, [t]he

benchmark for judging any claim of ineffectiveness must be whether counsel's conduct

42

so undermined the proper functioning of the adversarial process that the [proceeding] cannot be relied on as having produced a just result." *McQueen v. Scroggy*, 99 F.3d 1302, 1311-12 (6th Cir.1996).  Under *Strickland*, a court must presume that decisions by counsel as to whether to call or question witnesses are matters of trial strategy.  *See Hutchinson v. Bell*, 303 F.3d 720, 749 (6th Cir. 2002).

In this case, Petitioner's claim of ineffective assistance of counsel with respect to counsel's failure to object to the admission of Matthes's testimony from her preliminary examination and Colorite's testimony from her husband's preliminary examination is without merit.  Petitioner contends that her rights under the Confrontation Clause were violated because of counsel's failure to object.

In *Crawford v. Washington*, 541 U.S. 35 (2004), the United States Supreme Court held that "testimonial statements of witnesses absent from trial" are admitted "only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine."  *Id.* at 59.  Thus, "where testimonial statements are at issue, the only indicium of reliability sufficient to satisfy constitutional demands is the one the Constitution actually prescribes: confrontation."  *Id.* at 68-69.

The state court of appeals found that the preliminary examination testimony of those witnesses was testimonial.  *Belanger*, No. 256450, 2005 WL 3500839, at *5. Additionally, it is clear from the record that Matthes was unavailable to testify at Petitioner's trial because she could not travel due to illness, and Colorite was unavailable because of his Fifth Amendment privilege against self-incrimination.

With respect to Matthes's testimony, the prosecution offered it at the end of its case-in-chief.  The purpose was to provide details of Petitioner's relationship to the

Orban.  The jury heard Matthes's entire testimony, which was read into the record,

including defense counsel's cross examination.

In regard to Colorite's testimony, it was defense counsel, not the prosecution,

who offered it at trial:

> THE COURT: There will be testimony offered from the preliminary
> examination – from a preliminary examination, the testimony of one
> Steven Colorite.  That – the portions of his testimony will be read, such
> portions as it's argued by Defense Counsel impeach the testimony, at
> least partially, of [witness] Jason Belanger.  Since it's testimony being
> offered as impeachment, it's able to be read to you under the rule, and we
> are going to do that now.

(Trial Tr. vol. IV, 752, Mar. 10, 2004.)  The jury heard selected excerpts of Colorite's

testimony from Jason Belanger's preliminary examination as part of the defense's

strategy to impeach his testimony at Petitioner's trial.

The court concludes that the Michigan Court of Appeals' decision regarding

defense counsel's performance in regard to the admission of Matthes's and Colorite's

testimony was not contrary to, or an unreasonable application of, clearly established

Supreme Court precedent.  Contrary to Petitioner's assertion, the prosecution's

admission of Matthes's testimony from Petitioner's June 2003 preliminary examination

did not violated the Confrontation Clause, as it met all the requirements of *Crawford*:

Matthes was legitimately unavailable to testify at trial, her preliminary examination

testimony was testimonial in nature, and defense counsel had a prior opportunity to

cross examine her.  Accordingly, defense counsel's performance did not fall below an

objectively reasonable standard.

Likewise, defense counsel's decision to admit Colorite's testimony was sound

trial strategy; the purpose of admitting excerpts of Jason Belanger's September 2002

44

preliminary examination testimony was specifically to impeach him.  He was the main witness against Petitioner at trial.

The court finds that Petitioner's ineffective assistance of counsel claim is without merit.  Petitioner failed to demonstrate that defense counsel's performance was unreasonable or so prejudiced her as to be outcome determinative. Therefore, the court finds that, based on the evidence presented, Petitioner failed to raise a claim of federal-constitutional magnitude and is not entitled to habeas corpus relief regarding this claim.

## IV.  CERTIFICATE OF APPEALABILITY

A petitioner must receive a certificate of appealability ("COA") in order to appeal the denial of a habeas petition for relief from either a state or federal conviction.  28 U.S.C. §§ 2253(c)(1)(A), (B).  A district court, in its discretion, may decide whether to issue a COA at the time the court rules on a petition for a writ of habeas corpus or may wait until a notice of appeal is filed to make such a determination.  *See Castro v. United States*, 310 F.3d 900, 903 (6th Cir. 2002); *Lyons v. Ohio Adult Parole Auth.*, 105 F.3d 1063, 1072 (6th Cir. 1997), *overruled in part on other grounds by Lindh v. Murphy*, 521 U.S. 320 (1997).  In denying the habeas petition, the court has studied the case record and the relevant law, and concludes that, as a result, it is presently in the best position to decide whether to issue a COA.  *See Castro*, 310 F.3d at 901 (quoting *Lyons*, 105 F.3d at 1072) ("[Because] 'a district judge who has just denied a habeas petition . . . will have an intimate knowledge of both the record and the relevant law,'" the district judge is, at that point, often best able to determine whether to issue the COA).

A court may issue a COA "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  When a federal district

45

court rejects a habeas claim on the merits, the substantial showing threshold is met if the petitioner demonstrates that reasonable jurists would find the district court's assessment of the constitutional claim debatable or wrong. *See Slack v. McDaniel*, 529 U.S. 473, 484-85 (2000). "A petitioner satisfies this standard by demonstrating that . . . jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). In applying this standard, a district court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merit of the petitioner's claims. *Id.* at 336-37. When a federal district court denies a habeas claim on procedural grounds without addressing the merits, a certificate of appealability should issue if it is shown that jurists of reason would find it debatable whether the petitioner states a valid claim of the denial of a constitutional right, and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling. *See Slack*, 529 U.S. at 484-85. The court concludes that jurists of reason would not find the court's assessment of the constitutional claims debatable or wrong, or that the court's ruling regarding Petitioner's claims that are barred by procedural default is debatable. The court thus declines to issue Petitioner a certificate of appealability.

## V.  CONCLUSION

For the reasons stated above, IT IS ORDERED that Petitioner's "Petition for Writ of Habeas Corpus" [Dkt. # 1] is DENIED.

IT IS FURTHER ORDERED that the court DECLINES to issue a certificate of appealability.

S/Robert H. Cleland

46

ROBERT H. CLELAND
UNITED STATES DISTRICT JUDGE

Dated:  July 31, 2009

I hereby certify that a copy of the foregoing document was mailed to counsel of record
on this date, July 31, 2009, by electronic and/or ordinary mail.

 S/Lisa G. Wagner
Case Manager and Deputy Clerk
(313) 234-5522